UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

04 SEP 28 AM 10: 31

U.S. ...
N.D. ...

| | | |
|---|---|---|
| DEBRA SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 02-B-2115-NE |
| | ) | |
| GENERAL ELECTRIC COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**
SEP 2 8 2004

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 28.)[1] Plaintiff Debra Smith has sued her former employer, defendant General Electric Company, alleging that it discriminated against her on the basis of her race and that it retaliated against her for complaining about discrimination in violation of federal law. Plaintiff also alleges a breach of contract claim and a promissory fraud claim based on Alabama state law. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 28), is due to be granted.

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

# I. **SUMMARY JUDGMENT STANDARD**[2]

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every

---

[2]For purposes of summary judgment, all facts and reasonable inferences therefrom are drawn in favor of the plaintiff.

inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS

In 1978, defendant hired plaintiff to work as a Processor. (Doc. 30, Ex. 3 at 46-47.) In 1989, defendant promoted plaintiff to Machine Operator or "Controlman" in the Extrusion area. (*Id.* at 48-49.) The Extrusion area of the plant manufactures plastic liners for refrigerators. (*Id.* at 50.) There are four extruders in the Extrusion area, and plaintiff was responsible for operating Extruders 1 and 2. (*Id.* at 56.) Beverly Montgomery, white, was responsible for running Extruder 3 and maintaining the regrind filter system. (Doc. 30, Ex. 5, ex. 1; *id*, Ex. 6 at 124, 125.) Kenneth Wydener, white, was responsible for Extruder 4 and "for the material handling system on the deck." (Doc. 30, Ex. 6 at 124-25.)

Defendant's Employee Handbook contains a "Positive Discipline System." (Doc. 29, Ex. D at 22-23.) The Handbook states:

Positive Discipline System (P.D.S.) consists of three steps:

1. Oral Reminder – is a conversation between BTL[3] and the employee. This conversation will be documented for the BTL's own reference. The BTL will inform the employee that he/she is receiving an oral reminder. Will last for 3 months if no further violations.

2. Written Reminder – is a formal conversation with the BTL and the employee, providing the employee and personnel with a written record of conversation. Will last for 6 months if no further violations.

---

[3]BTL is "Business Team Leader." (Doc. 29, Ex. D at 8.)

3.   Decision Making Leave (D.M.L.) – the last and most serious step. Conversation between the BTL and the employee, ending with the employee being placed on a DML the following work day.  Will last for 1 year if no further violations.

D.M.L. is used if an Oral Reminder and Written Reminder have not resulted in improved performance.  It may also be used in those extremely rare cases where the violation is so serious that the lesser steps of the procedure are not deemed appropriate.

Depending on the seriousness of the offense – Steps may be skipped up to and including Termination.

(*Id.* (footnote added).) The Handbook also states that "willful insubordination, such as stated refusal to follow instruction" is a violation of its "Code of Ethics," and "will result in disciplinary action, up to and including discharge." (*Id.* at 1-2.) The Handbook states, "This publication is not an employment contract and is not intended to create contractual obligations of any kind. . . . It is our hope that the information provided will help you learn more about DPO[4] and your job." (*Id.* at 3 (footnote added).) The "purpose" of the Handbook is "to provide employees with a general understanding of our personnel policies at DPO." (*Id.* at 6.) Defendant "reserve[d] the right to change, revise, or eliminate any of the policies and/or benefits described in [the] handbook." (*Id.*)

The record contains another publication from defendant, which is entitled, *Integrity: The Spirit and Letter of Our Commitment*, dated October 2000.  (Doc. 29, Ex. I.) This document, which is a "guide" to defendant's "policies," (*id.*), contains the following disclaimer:

---

[4]"DPO" refers to Decatur Plant Operations. (*See* doc. 29, Ex. D.)

4

**Important**

> This guide and the policies described in it are not an employment contract. GE does not create any contractual rights by issuing the guide or the policies.

(*Id.* at 2.)

The record contains evidence that defendant counseled or otherwise disciplined Smith approximately 22 times in her 22 years of employment.  (Doc. 29, Ex. B and Ex. H ¶ 4.) Smith received at least five written reminders concerning her excessive absenteeism and tardiness.  (*See* doc. 29, Ex. A, exs. 3-6, 8.)  In addition to her attendance, defendant disciplined Smith for her job performance.

On January 29, 1997, she received an Oral Reminder for failing to document the operation of Extruder Number 1.  (*Id.*, ex. 7.)  Although her job duties required documentation at least two times per shift, Smith had not documented anything for four days. (*Id.*)  The Oral Reminder contains a "Note," which states that plaintiff had a "2nd occurrence" on February 24, 1997.  (*Id.*)

On August 20, 1999, Hopper gave plaintiff an Oral Reminder regarding her "job performance."  (*Id.*, ex. 10.)  Hopper noted:

> On Aug. 20 1999 Debra Smith and I discussed her job performance in the Extrusion Area.  Over the past three weeks of August[,] Debra has been performing at a below expected level for a D21 Controlman in the Extrusion Area.  On two separate occasions I had talked to Debra about the expectations that were required of her and she stated that she understood.  During this conversation Debra stated that she knew how to perform her job and had the training needed to do so.  With no training needed[,] I explained to Debra that this meant that it was not a *can't do* which falls under the policy[, but it was a] *won't do*.  Under the *won't do*[,] I explained that the avenue was to be

5

handled under the positive discipline procedure as per policy DPO 630[5] which dictates the use of discipline.  She stated that she understood what was expected from her as an Extruder Controlman.

(*Id.* (footnote added; emphasis added).)  Plaintiff testified that she did not remember the Oral Reminder regarding her job performance in August 1999, but she had no reason to dispute it.  (Doc. 30, Ex. 3 at 66-67.)

On July 22, 1998, Smith received a DML for insubordination.  (Doc. 29, Ex. A, ex. 9.)  According to the documentation prepared by Hopper, plaintiff had been told, on July 15, 1998, that she could not attend "non-work related training" during her "normal work hours." (*Id.*)  On July 21, 1998, Hopper found plaintiff in a non-work related training class during her work hours; the following day, he found her in the training class again during her work hours.  (*Id.*)  Hopper sent plaintiff home on DML.  (*Id.*)  Hopper wrote:

Debra, this disciplinary action (DML) is in line with the seriousness of the offense (insubordination), which should not occur within the work place.  The time frame for this DML will be 12 months.  Any violation(s) concerning work policies, attendance, appropriate job behavior, job performance, or the code of ethics will violate this DML 12-month period, and will result in your termination.  Performance, attendance, behavioral issues at the work place have been documented.  Your future with GE depends on your willingness to address these issues and correct them during this DML period.

(*Id.*)  Plaintiff contends that she was never told not to attend the class.  (Doc. 30, Ex. 3 at 63-64.)

---

[5]The Handbook states: "In all cases where an employee appears unable to perform the job, Business Team Leader and Human Resources must evaluate whether the lack of performance is a case of 'can't' or 'won't'." (Doc. 29, Ex. D at 37.)  "In those cases where the situation evaluation indicates the employee 'won't' perform on the job, the Business Team Leader should address the problem through the positive discipline procedure." (*Id.*)

On January 5, 2000, plaintiff received an Oral Reminder regarding "Parking Lot Safety" after Jerry Witten, Human Resources Manager, had observed her speeding in the parking lot. (Doc. 29, Ex. A, ex. 11 and Ex. H ¶ 1.) On January 10, 2000, while speeding through the parking lot, she almost hit Witten as he was exiting the guard shack. (Doc. 29, Ex. A, ex. 12.) She was given a Written Reminder regarding safety on January 14, 2000. (*Id.*) On January 19, 2000, Witten again saw plaintiff speeding in the parking lot and she received a second written reminder; she was told that further unsafe driving would result in a DML. (Doc. 29, Ex. A, ex. 13.)

On May 9, 2000, Hopper counseled plaintiff for failing to account for all the rejected plastic sheet she had placed in the grinder. (Doc. 29, Ex. A, ex. 14.) In a memorandum to her file, Hopper wrote:

> On Tuesday May 9th I discussed with Debra the need for her to account for all rejected sheet that she grinds on the scrap robot. I reminded her that we have had this discussion twice prior, and her [refusal] was [unacceptable].

(*Id.*) When asked about this "Counseling," plaintiff testified she did not have a discussion with Hopper or anyone else regarding using the scrap robot to account for her scrap sheets. (Doc. 30, Ex. 3 at 71.) She also testified that she did not remember the "Counseling." (*Id.*)

On August 25, 2000, a dispute arose between plaintiff and Paul Cummins, Process Control Engineer. (Doc. 30, Ex. 3 at 72-83 and Ex 4 at 15.) The dispute concerned plaintiff's response to Cummins's instructions that she run freezer sheets on Extruder 2, which were usually run on Extruder 4, and his request that she turn off the water leaking

from Extruder 1.    Plaintiff contends that Cummins harassed her and discriminated against

her. (*See* doc. 30, Ex. 3, ex. 16.)

Following this incident, plaintiff complained to Larry Hamilton, Human Resources

Representative, about her treatment by Cummins; Hamilton told her to file a grievance.

(Doc. 30, Ex. 3 at 197-98.)  Thereafter, she filed a grievance[6] on August 31, 2000, in which

she alleged that she had been harassed and discriminated against by Cummins in front of a

---

[6]The Grievance Procedure, according to the Employees Handbook, states:

The DPO Grievance Procedure consists of the following steps:

Step 1 – BTL meets with employee within 3 working days after receiving
notification of grievance and presents a written answer within 2 additional
working days.

Step 2 – Staff Level Manager meets with employee no later than 2 working
days after employee requests appeal of Step 1.  A written answer will be given
to the employee within 5 additional working days.

Step 3 – Grievance Review Panel/Plant Manager.  This step consists of two
options.

> Option 1 – If the employee so desires the grievance shall go directly to
> the Plant manager for appeal.

> Option 2 – If the employee so desires the grievance shall go directly to
> the Grievance Review Panel.  The Grievance Review Panel shall
> consist of the Plant Manager, Staff Level Manager, and hourly
> employees whose names are drawn from a list of eligible panelists.

The Plant Manager or Review Panel shall meet with the employee within ten
(10) working days after notification and shall provide a written answer within
two (2) working days.

(Doc. 29, Ex. D at 39-40.)

co-worker. (*Id.*, ex. 16.) She also alleged that Cummins had "harassed [her] about a job that another co-worker should have done when maintenance was finish[ed] with the machine." (*Id.*) She stated that she wanted "[t]o be treated fair" and "[r]espect[ed] . . . around [her] co-workers." (*Id.*)

Following plaintiff's complaint to Hamilton, Neal Lumpkins, Operations Manager, initiated an investigation into the events of August 25, 2000. (Doc. 30, Ex. 5 at 98-99 and ex. 12.) Lumpkins and Linda Brooks, Human Resources Specialist, interviewed plaintiff and Cummins, as well as Tim Pope, Process Control Engineer, Dennis Shavers, Material Mover for the Extrusion Area, Phillip Kelly, a maintenance worker, and Glenda Aldridge, Operator. (*Id.* at 99, and exs. 1, 3, 4, 6-9; doc. 30, Ex. 1.) Brooks typed the statements and later she had the witnesses come back and sign them. (Doc. 30, Ex. 8 at 47-48.)

Plaintiff met with Lumpkins and Brooks during their investigation. Her discussion was documented as follows:

> Friday morning there were water leaks on machines #s 1 and 4. Number one normally runs 18 ft. sheet and number 4 normally runs freezer sheet[s]. Debra reported to work at 3:30 AM that day due to Jerry Boyd's, third shift control, medical absence. She finished running number one and shut it down for repairs. The inventory on this product was full enough at that time for her to shut down for repairs and maintain inventory. Stanley Scott called, talked with Debra, and asked if he needed to come in early to cover for Kenneth [Wydener]. Debra conferred with Tim Pope, acting business team leader, who told her that we would probably not need Stanley but he would contact Stanley. Tim asked Debra to tell Beverly Montgomery to run #s 3 and 4 machines. Debra asked that Tim tell Beverly, as she didn't want to cause issues by giving work direction to a peer.
>
> Debra said [that, at] about 10 am[,] Paul Cummins, Process Engineer, came to her and asked what are we going to do on numbers one and two. She told him

number one had a water leak.  Paul told her number two needed to be started
to run freezers.  He said number four was having problems with a water leak.
[She] told him all they had to do was put in a seal.  Paul insisted [she] run
freezers – [she] didn't say [she] wouldn't run freezers but [she] needed to catch
up on [her] inventory.  (14/16 sheet).

Paul went over to #4 and stated that maintenance was going to be on #4 for
awhile.  Debra told Paul she wanted to catch up on her inventory and then go
to freezers.  Paul insisted that Debra run freezers.  Debra says she was going
to start 2 in freezers and turn the machine on.

She then walked over to see Glenda Aldridge.  While they were talking Paul
walked up and asked if she heard his page.  He said, "[D]ammit, did you hear
my page?"  Paul was standing to the back of Debra and when he spoke, she
turned around.  She said, "[W]hat[?"]  He asked again if she heard his page.
She told him she did not hear it.  [Cummins then said,] "I want you over here
now, I mean right now.  You need to get to your machine now, you go now –
get back to your damn machine now."  Debra says Paul raised his voice when
saying this to her.  She told him she would go back when she finished talking
to Glenda.

Glenda had told her [that Cummins] had no right to talk to her like that and
that Wayne needed to hear this, that [Cummins] was very disrespectful.
[Plaintiff said that] [i]t was a shock to Glenda and me.  [She said she] told Paul
[she] would be there in just a second.  [She] was in a state of shock.  [She]
couldn't believe he would treat [her] so cruelly.  Debra told Paul that he had
harassed her enough.  And "you don't have the right to talk to me like that[."]
She told him that Wayne is my supervisor and doesn't talk to me like that.

[Plaintiff] asked Paul if number 4 [was] going to run and he said he had
nothing else to say to [her].  [She] went to maintenance and they said Paul told
them to take their time and number four would no longer be running that day.
Debra said she told Paul that they could run number one even with a leak and
he said he didn't want [her] to – said he would call Safety if she ran it.  [She]
told him this could be done and it had been done before.  They had no more
conversation that day and Debra says she [ran] freezers.  Number 4 was
repaired about 1:15.  Number one wasn't fixed until Monday, 8/29.  #3 was
running during the day but was shut down due to moisture.  Paul told Debra
it ran out of material.  Debra said, "Beverly's machine was shut down and he
told me to run her production[."]  She stated Paul sometimes confers with
Dennis and Beverly and then forcefully recommends things for her to do.

10

Debra says she told Paul he is going to respect [her] out on the floor. [She] [s]ays her relationship with Paul is strained. She says he has helped at times but there have also been times when he is way out of line, according to Debra.

Example of behavior

Debra stated that Paul come over to her one day and told her she was crazy. She says he has harassed her several times – one day when they were talking Hopper came over and Paul was in a good mood. Hopp[er] said, "take her back there and hit her[."] Paul said, "No, I can't do that[."] She says Hopper wasn't teasing.

(Doc. 30, Ex. 5, ex. 7.) Plaintiff signed this statement. (*Id.*)

Cummins, in his conversation with Lumpkins and Brooks as set forth below, described the incidents of August 25, 2000, somewhat differently. Per his statement, he told Lumpkins and Brooks the following:

Paul says he went to the extrusion area about 9 or 9:30 AM and that machines 1, 2, and 4 [were] down. Four was being worked on by Morgan Middleton and Phillip Kelly. Number 4 had a water leak and a shear problem. He suspected it would be down for several hours.

He was told that number one was shut down due to inventory being full. Paul checked inventories and found that 14/16 was down 20%; 18 ft. was full and freezers were down 50%.

Paul decided that freezers needed to be run on number two. He went over to talk to Debra Smith and discovered there was a pump leak in number one. He asked her to shut off the water. Debra failed to turn it off and Paul shut it off about ten minutes later. [Lumpkins and Brooks] asked if she heard him and he said she gave a nonverbal response, shrugging of shoulders. She was attempting to air lance the die in number one and was "picking at it". Paul instructed her how to do it. He said[,] at that point[,] they discussed the status of #4 and he asked her if she had checked inventory and she said no. Paul explained that they needed to change number two to freezers and at this point he looked at number two and saw that it was already hot and ready to run. Debra argued to wait on #4 to come up and run freezers. She told him that Tim had told her to run 14/16s. Paul tried to emphasize the need to change it

11

over. Paul said he went to find Tim and couldn't find him. He went back to number 4 about 10 am (?? Not sure of time) to check the status.

Debra came to the group at number 4 (Phillip Kelly, Morgan Middleton, Paul). Paul asked her to run number 2 in freezers. Debra said number 4 would be ready soon and that she wasn't going to run freezers. She stated that she did not care about freezers, that she just ran fresh foods. She stated, at least twice, that she wasn't going to run freezers. Phillip Kelly overheard her. Paul asked, ["S]hould I call Mr. Hopper[?"] And she responded with, ["D]o what you want to[."] Wayne wasn't at work that day so Paul found Tim Pope. Tim asked, ["W]hat's going on with Debra[?"] Q: How many times did she say[ ] she wasn't going to run freezers? Paul said 2 or 3 times. Q: Why do you think she didn't want to run freezers? Paul said [he] didn't know unless it's because it takes a little work to switch the machine. Paul said he went looking for Tim[.] Paul said he had asked Dennis, "What would you do?" and Dennis said, convert to freezers on Debra's machine. Paul and Tim discussed inventory and Tim went to tell Debra to start number 2 for freezers. Paul got involved in other maintenance issues.

[Cummins stated that he] paged Debra a couple of times but got no response (about 10:30). Dennis indicated by pointing that Debra was talking to Glenda. [Cummins] went over there. Paul asked her if she had heard [his] page. She gave a vague response – shoulder shrug. [He] asked again [and] she said no. Paul got the impression that she [had] heard it but didn't want to admit it. Paul asked if she would run freezers in number 2 and she said the machine wasn't hot. Paul said it was hot. Paul said[, "W]e need to start it up now[,"] and Debra said she would start it in a little bit. Paul said he was there a couple of minutes and as far as he knew Debra went to start the machine.

Later, after she started the machine, Paul went by the 18 ft. conveyor and it was all hung up. The grinder was backed up. Debra was loading by hand rather than let[ting] the robot feed the scrap. Paul says she has a tendency to load 18' grinder by hand – rather than go by robot, which counts the sheets. She continued to feed it by hand. She said, "I'll be all right". When its [fed] by hand, the scrap isn't counted.

(Doc. 30, Ex. 5, ex. 3.) Cummins signed the statement on September 6, 2000. (*Id.*)

Lumpkins and Brooks also obtained a statement from Phillip Kelly, the maintenance

worker that Cummins said overheard part of his conversations with plaintiff. (*Id.* and *id.*, ex.

6.) Kelly's statement to Lumpkins and Brooks is as follows:

> Paul asked Debra to run the sheets that #4 makes on #2 extruder. She wanted
> to wait until #4 was repaired and start it up and run. Paul's problem was that
> the sheets #4 made were getting low because of problems throughout the week.
> If Paul let her run #4[,] second shift would have to start up #4 and run parts
> because of the amount of time it takes to heat the machine. By changing
> number 2[,] which was already hot[,] they would gain over half the shift of
> parts instead of being further behind. Paul repeatedly asked Debra to change
> her machine over and she refused[,] telling him she would not change it over
> and was very adamant about it.
>
> Paul then asked if she wanted to go see Wayne Hopper, she replied that Wayne
> was not there and it would not do any good to see him. This went on for 4 to
> 5 minutes more and Paul left. I did not see him [until] we were nearly finished
> after lunch. He then asked me if I had heard what he did. When our
> discussion was finished we found we had heard the same thing.

(*Id.*) Kelly signed this statement on September 29, 2000. (*Id.*)

Lumpkins and Brooks also obtained a statement from Glenda Aldridge, the coworker

with whom plaintiff was talking when she contends Cummins harassed her. The

memorandum documenting the conversation states as follows:

> Glenda said Debra Smith had walked over to her area and they were talking.
> Debra was facing Glenda; Paul walked up to Debra's left side. Glenda said he
> seemed upset but she did know what set him off.
>
> Paul asked Debra if she heard his page, he said he paged her 3 or 3 [sic] times.
> Debra said she did not hear it. Glenda said she did not hear either. Then Paul
> said to Debra, you need to come on now, and she said "for what?". He said
> something about rolls that Glenda didn't understand. He told Debra, "[Y]ou
> need to start the machine." Debra said[,] "[F]or what". Paul said you need to
> start up now. Then Debra said, "I'll be there in a minute when I finish talking
> with Glenda". Paul stated that she needed to come back to her job right now

13

and start running freezers. Glenda said she looked to her left and saw Beverly, Dennis, and Chris Jeffreys watching, "grinning like Hyenas". Debra told Paul that she didn't have to start up now. Paul said that she needed to start up now. Glenda says she stated, "that's it", and started calling for Wayne or Tim (on the phone). She said Paul left and went back to the "huddle". Glenda asked her why Paul was treating her like this. Debra told her they want my job. She stated that Ken, Beverly, and Dennis put Paul up to things. Glenda stated in the interview that she felt Paul handled the situation the wrong way and was "showboating". She also stated in the interview that Debra is just an easy person and worries about things too much. Glenda stated that Paul used no profanity in this conversation. Glenda also stated that Paul always comes and get[s] Debra if he misses her. Glenda stated that Paul was aggressive in his conversation with Debra.

(Doc. 30, Ex. 5, ex. 8.) Aldridge signed this statement on September 6, 2000. (*Id.*)

Tim Pope, the acting BTL on August 25, 2000, also gave a statement regarding the

incidents of August 25th; his statement is as follows:

On Friday morning, 8/25/00, around 9:30 am Debra Smith came to Wayne Hopper's office to talk to me about changing over her machine, extruder #2[,] to freezer sheets. Extruder #4 was down to have a water leak repaired. She told me Paul Cummins had asked her to change it over but she felt it unnecessary because #4 would be fixed in time to run freezer sheet. I told Debra I wanted to talk to Paul and I would come back and talk to her later. Shortly after [the] conversation with Debra[,] I [met] Paul in the [aisle] in front of #7 thermoformer. I asked Paul what the problem was with Debra. He told me he had asked her to change over #2 extruder to freezer sheet because #4 was going to be down for a long time and she, Debra Smith, had refused to change over the machine. I further investigated this [matter] and found that maintenance (Morgan Middleton) was to repair the extruder sheer. I witnessed the clutch on the sheer coming apart and saw several teeth missing on the gear and the wear plate in bad shape. While watching the clutch come apart Debra approached me again and I told her she needed to do what Paul has asked her to do.

(Doc. 30, Ex. 5, ex. 4.) Pope signed his statement on September 6, 2000. (*Id.*)

14

Lumpkins and Brooks also spoke with Dennis Shaver, the Material Mover in the Extrusion Area. (Doc. 30, Ex. 5, ex. 1 and ex. 9.) The conversation was recorded as follows:

> 9 to 9:30 AM
>
> Machine #4 – Paul Cummins and Debra Smith and 2 maintenance people. Saw them talking – did not hear anything but it didn't look friendly – body language from Debra didn't look friendly.
>
> 45 minutes later – Paul paged Debra. Then he paged her agin. She heard the page – she had [to]. Paul asked if I had seen her. I pointed to where she was talking to Glenda Aldridge.
>
> I saw a 2 or 3 minute conversation between Paula [sic] and Debra. Never saw Glenda say anything. I did see Glenda page Time [sic] but it was after Paul left. Debra stayed 3 to 5 minutes after Paul left. The only gesture[ ] I saw [was] Paul raising his arms in a question. I don't think Debra ever looked at him. He was standing to the side of Debra.

(*Id.*, ex. 9.) Shavers signed this statement on September 6, 2000. (*Id.*)

During the investigation, Cummins reported that plaintiff was hand feeding the grinder and not using the scrap robot on the afternoon of August 25, 2000. (*See* doc. 30, Ex. 5, ex. 3 at 0020.) Cummins testified that plaintiff was hand loading a "nearly full pallet of sheet." (Doc. 30, Ex. 4 at 182.) According to Cummins, when he told plaintiff that she needed to use the robot because it counted the scrap, plaintiff continued to feed the grinder by hand and told Cummins, "I'll be alright." (*Id.* at 183-84; *id.*, Ex. 5, ex. 1 at 0024.) Plaintiff testified that she did not hand feed sheets into the grinder that day but she did not remember using the robot that day. (*Id.*, Ex. 3 at 82.)

Based on the results of the investigation, which had begun with plaintiff's grievance alleging Cummins harassed her and discriminated against her, defendant decided to

discipline plaintiff. (Doc. 30, Ex. 5 at 110-11.) Lumpkins, Hopper, and Witten decided

termination was the appropriate level of discipline based on plaintiff's insubordination and

because of other problems as shown by her work history. (*Id.* at 115 and *id.*, Ex. 6 at 68-69.)

On September 11, 2000, two days before her termination, Hopper sent plaintiff the

following memo regarding her grievance –

> The Company is in the process of conducting a thorough review of your
> behavior at work on August 25, 2000, based on complaints raised by Paul
> Cummins, Process Engineer, and Tim Pope, acting TBL. . . .
>
> Unfortunately, on August 25, 2000, you refused to take work direction clearly
> communicated to you by Mr. Cummins and Mr. Pope, which resulted in the
> conversation with Mr. Cummins that took place in the presence of one of your
> coworkers [that was the subject of plaintiff's grievance]. In the future, the
> Company expects you to follow work directions promptly such that there will
> be no need to have another conversation of that type with you. Should such
> an occasion arise and you desire to discuss the matter privately, you should ask
> the supervisor or manager to do so. Mr. Cummins and Mr. Pope have been
> made aware that you have complained of this recent matter being aired in front
> of a co-worker. They will be requested to be sensitive to such matters and to
> honor requests to discuss such matters privately in the future as appropriate
> under the circumstances.

(Doc. 30, Ex. 6, ex. 2.) Plaintiff did not pursue her grievance beyond Step One. (*Id.*, Ex. 3

at 100.)

On September 13, 2000, plaintiff met with Lumpkins and Hopper. Lumpkins's record

of "termination discussion" states, in pertinent part, as follows:

> I explained to Debra that this a [sic] follow up to the investigation of the
> incidents that occurred on 8/25/00. I told her that we had received some
> information while investigating her grievance and that we had conducted a
> very thorough investigation of all incidents related to the grievance. I
> confirmed with Debra that the grievance had been settled and that actions were
> taken accordingly.

16

I then told Debra that Linda Brooks (HR Specialist) and I had interviewed several people in an effort to obtain facts about the incident on 8/25. Our investigation revealed that she had adamantly refused to take work direction when asked to change over extruder #2 to freezer sheet and begin running. I informed her that we had determined that her refusal to take work direction was considered insubordination. I informed her that we had reviewed her work history and based on previous occurrences of failure to follow instructions and a prior disciplinary action for insubordination, we had decided to terminate her employment.

Debra seemed surprised by the decision. She said, "[Y]ou can't do this. You have to consider my side." I explained to Debra that we do not enter into these decisions lightly and that we did a very thorough investigation in this case. I also told her that the facts had been reviewed up through the channels to insure that we were making the right decisions.

I asked Debra to read the letter of termination and understand what it stated. Debra read the letter and questioned the reference to the incident that resulted in her prior discipline for insubordination. She stated that she never got to explain her side of that situation. Wayne Hopper reminded her of the facts related to that situation and also reminded her that she had the opportunity to grieve that decision but chose not to.

Debra stated that she never said she would not run the freezer sheets on #2. I told her that we had statements from witnesses that heard her tell Paul that she was not going to run freezer sheets.

I explained to Debra that this decision was final and that she needed to focus on what her options were going forward.

Debra asked who the witnesses involved were. I told her there were several people involved. She asked how many? I told her six or seven. She again stated that she had not said she would not run freezer sheet. . . .

(Doc. 30, Ex. 1.) The letter of termination, given to plaintiff during her meeting with Hopper

and Lumpkins, states:

The Company has completed its investigation of the events of August 25, 2000 and has determined that on that date you failed to adequately perform the duties of your job and to follow proper procedures. You were insubordinate

17

in response to work instructions given to you with regard to turning off a water supply to control a leak, to promptly change over a machine to address production needs as instructed, and to make use of the robot and grinder counter when processing scrap material.

You have previously received counseling, oral reminders, and a decision making leave day for prior instances of poor job performance, insubordination, and failure to follow required procedures. Accordingly, your employment is terminated.

(Doc. 30, Ex. 3, ex.18.)

After her termination plaintiff filed a grievance. (Doc. 30, Ex. 3, exs. 19, 20.) Plaintiff's grievance was denied at Step One, (doc. 30, Ex. 6, ex. 4),[7] and she proceeded to Step Two of the grievance procedure. At step two, Lumpkins reopened the investigation and was "unable to find any factual information that would convince him that plaintiff was wrongfully terminated. Therefore, he upheld the termination decision at step two of the grievance process. (Doc. 30, Ex. 5, ex. 12.)

Plaintiff proceeded to Step Three; at this step plaintiff's grievance was considered by a Peer Review Panel. Plaintiff had a role in selecting some of the members of the Review

---

[7]The Step One denial stated:

This letter is in response to our discussion on Thursday, 9/28/00. regarding Step One of your Grievance Number 018. The matter of August 25, 2000, has been thoroughly investigated, and you brought forward no new information or facts to be considered. Therefore, I must uphold the decision to terminate your employment. The other issues you raised in the grievance you filed after your termination are irrelevant to the decision to terminate you and are therefore moot.

(Doc. 30, Ex. 6, ex. 4.)

Panel. (Doc. 29, Ex. A at 108.)  Wilber Whitfield, Grievance Panel Facilitator and 14/16

Operations Manager,[8] notified plaintiff that her grievance had been denied; he stated:

> After close and careful consideration of the testimonies you and several
> witnesses gave the peer review panel, the panel decision is to deny your
> grievance. The majority of the panel felt that GE acted consistent with policy
> and similar actions in similar cases.

(Doc. 30, Ex. 3, ex 23.)

On August 30, 2002, plaintiff filed a Complaint in this court alleging race

discrimination and retaliation in violation of 42 U.S.C. § 1981.  She also alleged claims for

breach of contract and promissory fraud in violation of state law.

### III. DISCUSSION

#### A. STATUTE OF LIMITATIONS

Defendant contends that "any allegedly harassing or discriminatory events occurring

before August 30, 2000, are time barred" because the statute of limitations for § 1981 claims

in Alabama is two years.  (Def. Reply Br. in Supp. of Mot. for Summ. J. at 1.)  On February

6, 2004, when defendant filed its Motion for Summary Judgment, the statute of limitations

for plaintiff's claims was recognized in this Circuit to be two years, the length of the statute

of limitations for personal injury claims in Alabama. *See Miller v. Bed, Bath & Beyond, Inc.*,

185 F. Supp. 2d 1253, 1262 (N.D. Ala. 2002)(citing *Peterson v. BMI Refractories*, 132 F.3d

1405, 1414 n.16 (11th Cir. 1998).  However, on May 3, 2004, the Supreme Court decided,

in *Jones v. R. R. Donnelley & Sons Co.*, _____ U.S. _____, 124 S. Ct. 1836 (2004), that the

---

[8]Wilber Whitfield is African American.  (Doc. 29, Ex. A at 108-09.)

statute of limitations was four years, pursuant to 28 U.S.C. § 1658(a)[9] for § 1981 claims that were not actionable before the 1991 amendments to the Act.

The Supreme Court held:

> As first enacted, § 1981 provided in relevant part that "all persons [within the jurisdiction of the United States] shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 14 Stat. 27. We held in *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989), that the statutory right "to make and enforce contracts" did not protect against harassing conduct that occurred after the formation of the contract. Under that holding, it is clear that petitioners' hostile work environment, wrongful discharge, and refusal to transfer claims do not state violations of the original version of § 1981. In 1991, however, Congress responded to Patterson by adding a new subsection to § 1981 that defines the term "make and enforce contracts" to include the "termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

*Jones*, 124 S. Ct. at 1839-40. The Court held, "Because petitioners' hostile work environment, wrongful termination, and failure-to-transfer claims did not allege a violation of the pre-1990 version of § 1981 but did allege violations of the amended statute, those claims 'ar[ose] under' the amendment to § 1981 contained in the 1991 Act;" and, therefore, their claims were "governed by § 1658's 4-year statute of limitations." *Id.* at 1845, 1846.

Like the petitioners in *Jones*, plaintiff's § 1981 claims arise under the 1991 amendment. Therefore, the proper statute of limitations for her claims is four years. Any claim that arose on or before August 29, 1998, is time-barred.

--------

[9]Section 1658(a) provides, "Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues." 28 U.S.C. § 1658(a).

The evidence is undisputed that plaintiff received the DML for attending the Excel training class during her normal work hours on July 22, 1998. Because this incident occurred more than four years before plaintiff filed her Complaint in this action, any claim based on her DML leave is due to be dismissed as time barred.

## B. RACIALLY DISCRIMINATORY DISCIPLINE CLAIM

### 1. Oral Reminder for Job Performance

On August 20, 1999, plaintiff was issued an Oral Reminder regarding her job performance. (*See* doc. 30, Ex. 3, ex. 10.) The Oral Reminder stated that plaintiff had been performing her job at a level below expectations for three weeks. (*Id.*) Moreover, the Oral Reminder stated that problem was because plaintiff would not do what was expected of her as an Extruder Controlman. (*Id.*) Despite the length and seriousness of the performance problems at issue in the August 1999 Oral Reminder, plaintiff testified that she did not remember the incident, although she did not dispute it.

"Whether an action is sufficient to constitute an adverse employment action . . . must be determined on a case-by-case basis using both a subjective and an objective standard." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (2000). Nowhere in plaintiff's evidence or argument does she testify that she considered this disciplinary action to be adverse. She testified only that she did not remember the incident. (Doc. 30, Ex. 3 at 66-67.) The court holds that plaintiff's testimony is insufficient to establish that she subjectively considered this Oral Reminder to be an adverse employment action.

Therefore, any claim based on the August 1999 Oral Reminder is due to be dismissed.

21

### 2. Counseling Regarding Use of the Scrap Robot

On May 9, 2000, defendant issued plaintiff a "Counseling" regarding her failure to "account for all the rejected sheet[s] that she grinds on the scrap robot." (*See* doc. 30, Ex. 3, ex. 14.)  When asked about this "Counseling," plaintiff testified she did not have a discussion with Hopper or anyone else regarding using the scrap robot to account for her scrap sheets. (Doc. 30, Ex. 3 at 70-71.)  She also testified that she did not remember the "Counseling." (*Id.* at 71.)

The court holds that plaintiff's testimony is insufficient to establish that she subjectively considered this "Counseling" to be an adverse employment action.

Based on the foregoing, the court finds that plaintiff cannot establish that she has a claim for disparate discipline based on the August 1999 Oral Reminder or the May 2000 Counseling.  Therefore, defendant's Motion for Summary Judgment as to plaintiff's discriminatory discipline claim will be granted.

## C. RACIALLY DISCRIMINATORY WORK ASSIGNMENTS CLAIM

Plaintiff contends she "was required to do more and harder work than her white co-workers at the same job." (Pl. Response to Mot. for Summ. J. at 11.)  She contends:

> [Plaintiff] was required to do her white co-workers' work on a weekly basis, denied help from her white co-workers on a weekly basis even though they were just standing around because their machines were down, while at the same time was required to help her white co-workers when her machines were down, and of being assigned work that, unlike her white co-workers, caused her machine to have high scrap rates and consequently her to have more work, poorer performance and oral counseling . . . on a weekly basis."

(*Id.* at 10-11.)

22

The Eleventh Circuit has held that "Title VII is not designed to make federal courts sit as a super-personnel department that reexamines an entity's business decisions. Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001)(quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997)). Thus, "applying the adverse action requirement carefully is especially important when the plaintiff's claim is predicated on his disagreement with his employer's reassignment of job tasks." *Id.* The court noted, "In the vast majority of instances . . . we think an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause . . . ." *Id.* at 1245 (citations omitted).

According to the record before the court, plaintiff was assigned to run two extruders; her white co-workers Montgomery and Wydener were assigned only one extruder each. However, Montgomery and Wydener had additional duties. Wydener was responsible for material handling on deck and Montgomery was responsible for the regrind filter system. Plaintiff also contends that she was asked to help Montgomery and Wydener, but Montgomery and Wydener were not asked to help her. The court finds that this evidence is insufficient to allow a reasonable jury to find that her work assignments – as compared to Montgomery and Wydener – constituted an adverse employment action.

23

Therefore, defendant's Motion for Summary Judgment as to plaintiff's work assignment claim will be granted and such claim will be dismissed.

## D. HOSTILE ENVIRONMENT RACIAL HARASSMENT CLAIM

Plaintiff alleges that she was subjected to work environment that was hostile due to her race. She contends that she was given a harder workload, she was belittled by Cummins and Hopper on a weekly basis, her white co-workers laughed at her, Cummins might have called her the N-word,[10] and Hopper told Cummins to hit her. (Pl. Br. in Opp. to Mot. for Summ. J. at 16-17.)

---

[10]The court doubts whether plaintiff's testimony, even viewed in her favor, establishes a question of fact as to whether Cummins actually used the N-word. Plaintiff testified, "Paul as always trying to be – talk down to me. And one day he said something to me, and I couldn't remember exactly what he said, I *thought* I heard him say, you know, he called me "nigger" that day." (Doc. 30, Ex. 3 at 194 (emphasis added).) She also testified:

> Q. . . . In response to your attorney's question, you said that Paul Cummins had used a racial slur. And that you couldn't remember what he said but you thought *maybe* he called you "nigger" in 2000. Am I characterizing your testimony correctly?
>
> A. Yes.
>
> Q. Did you tell anybody at GE management that you had been called "nigger" by a GE employee?
>
> A. I didn't say anything about it because I asked him, I said, ["] what you say[?"] He wouldn't repeat his self. I was *pretty positive* that he did say it . . . .

(Doc. 33, Ex. A at 215 (emphasis added).)

24

"A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)(citations and internal quotations omitted).  To establish a prima facie case of hostile work environment racial  harassment, plaintiff must show:

> (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome [racial] harassment; (3) that the harassment was based on her [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists.

*Hulsey v. Pride Restaurants, L.L.C.*, 367 F.3d 1238, 1244 (11th Cir. 2004); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)(en banc).

"[A racially] objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993)).  The *Faragher* court stated:

> We directed courts to determine whether an environment is sufficiently hostile or abusive by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." [*Harris*, 510 U.S.] at 23. ... "[S]imple teasing, [*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998)], offhand comments, and isolated incidents (unless extremely

25

serious) will not amount to discriminatory changes in the "terms and conditions of employment."

*Faragher*, 524 U.S. at 787-88. In other words, the "discriminatory intimidation, ridicule, and insult," *Miller*, 277 F.3d at 1275, "must be 'so intimidating, offensive, or hostile that it **poisoned** the work environment,'" *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003)(quoting *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir.1999))(emphasis added). "Discourtesy or rudeness should not be confused with racial harassment. Similarly, a lack of racial sensitivity does not, alone, amount to actionable harassment." 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 349 (3d ed. 1996), *quoted in Faragher*, 524 U.S. at 787.

Plaintiff alleges that she was given more work than her white co-workers, she was belittled and derided in front of and by her white co-workers, and, maybe, Cummins called her the N-word, once. Only one of these incidents is obviously race-related, but it might not have occurred. These incidents are not "sufficiently hostile or abusive and pervasive to establish a Title VII hostile environment claim."[11] *See Herawi v. State of Alabama Dept. of*

---

[11]The court notes:

It is beyond question that the use of the word "nigger" is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001)(ellipsis in original) (quotation marks omitted); *see also Daso v. The Grafton School, Inc.*, 181 F. Supp. 2d 485, 493 (D. Md. 2002)("The word 'nigger' is more than [a] 'mere offensive utterance'. . . . No word in the English language is as odious or loaded with as terrible a history."); *NLRB v. Foundry Div. of Alcon Indus.*,

*Forensic Sciences*, 311 F. Supp.2d 1335, 1351 (M.D. Ala. 2004)("Herawi's evidence shows that Ward yelled at her on a number of occasions; that Ward told her that no one liked her, that she did not belong in the department, and that people were calling to ask about her; that Ward threatened to report her to law enforcement; and that Ward stared or smirked at her and mocked her by repeating her in a high-pitched voice. The court cannot find that a reasonable person would objectively find that these comments, while hostile and offensive, were sufficiently hostile or abusive and pervasive to establish a Title VII hostile environment claim."); *see also Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir.)("Conversations between an employee and his superiors about his performance do not constitute harassment simply because they cause the employee distress."), *cert. denied* 525 U.S. 963 (1998); *Padron v. BellSouth Telecommunications, Inc.*, 196 F. Supp. 2d 1250, 1260 (S.D. Fla. 2002)("Plaintiff asserts that '[Defendant] routinely reprimanded and threatened [Plaintiff] with disciplinary action.' The examples given by Plaintiff do not show that any disciplinary action taken by [Defendant] constitutes harassment. In contrast, the allegations of Plaintiff are consistent with any workplace environment where an employee will be corrected by a

---

*Inc.*, 260 F.3d 631, 635 n.5 (6th Cir. 2001)("That the word 'nigger' is a slur is not debatable."). "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)(citations and internal quotation marks omitted).

*McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004). However, testimony that she is only "pretty positive" that Cummins used the N-word and that she never reported her belief to anyone, tempers the vitriolic effect the epithet may have on a work environment.

supervisor.  Even if [Plaintiff] was treated rudely by supervisors, this does not constitute harassment.") (internal citations omitted), *aff'd* 62 Fed. Appx. 317 (2003); *Campbell v. Dominick's Finer Foods, Inc.*, 85 F. Supp. 2d 866, 873-74 (N.D. Ill. 2000)(Plaintiff has failed to submit any evidence in support of his hostile work environment claim.  He claims that he was subjected to constant and harassing discipline that other employees were not subject to.  However, the reason Plaintiff was disciplined appears to have had absolutely nothing to do with his race.  Rather, from a review of the record, respectfully, such discipline appears warranted.  . . . Even assuming *arguendo* that the challenged conduct did amount to harassment, it is still not actionable, as there simply was nothing intrinsically or extrinsically racial about it.").

Because plaintiff has not offered evidence on which a reasonable jury could find that she was subjected to harassment sufficiently severe and pervasive to alter the terms and conditions of her employment, defendant's Motion for Summary Judgment as to plaintiff's hostile environment claim will be granted and such claim will be dismissed.

**E. TERMINATION CLAIMS**

Plaintiff claims that she was terminated on the basis of her race and in retaliation for complaining about race discrimination.  The court assumes, without deciding that plaintiff can establish a prima facie case of discrimination and retaliation.  However, "because [the court] find[s] that [defendant's] legitimate reason[ ] for the decision [is] dispositive." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).   Defendant

contends that plaintiff "was terminated based upon her insubordinate behavior and her negative work history." (Def. Mem. in Supp. of Mot. for Summ. J. at 13.)

Plaintiff may establish that defendant's articulated reason is a pretext for discrimination or retaliation "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989)(quoting *Goldstein v. Manhattan Industries*, 758 F.2d 1435, 1445 (11th Cir.)(citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)), *cert. denied* 474 U.S. 1005 (1985)). If a plaintiff chooses to establish pretext by showing that her employer's proffered reason is unworthy of credence, she must attack that reason "head on and rebut it." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). Plaintiff must offer evidence that "casts sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Ry. Co.* , 37 F.3d 603, 605 (11th Cir. 1994)).

"A plaintiff trying to show pretext based on a defendant's dishonest belief of the grounds the defendant gave for his decision does not succeed by presenting evidence that the defendant was mistaken about the facts upon which he based his alleged non-discriminatory decision." *Woodard v. Fanboy, L.L.C.*, 298 F.3d 1261, 1265 (11th Cir. 2002). Therefore, "plaintiff must present evidence from which a reasonable jury could find that [the decisionmakers] did not honestly believe the facts upon which [they] allegedly based [their]

29

non-discriminatory decision." *Id.* (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002); *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1260 (11th Cir. 2001)). The "pretext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1276 (11th Cir. 2002)(citations omitted). "'Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.' When evaluating a charge of employment discrimination, then, [the court] must focus on the actual knowledge and actions of the decision-maker." *Id.* at 1274 (quoting *Silvera*, 244 F.3d at 1262 and citing *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir.2001)).

The undisputed evidence shows that plaintiff complained to Brooks and Lumpkins about Cummins's treatment of her on August 25, 2000. As a result of her complaint, Brooks and Lumpkins began an investigation that included interviewing both plaintiff and Cummins, as well as other witnesses to the incidents. Based on this investigation, Lumpkins, Hopper, and Witten decided plaintiff had been insubordinate to Cummins on August 25, 2000, and should be disciplined. Based on her record of disciplinary action, they decided that plaintiff should be terminated. None of the decisionmakers were witnesses or participants in the events of August 25, 2000.

As evidence that these reasons for her termination are unworthy of credence, plaintiff argues:

30

1. "Hopper knew of no other white employees written up for not using the robot grinder, though Cummins had reported them to him." (Pl. Response to Mot. for Summ. J. at 14.)

2. "Cummins did not voluntarily bring these allegations of insubordination, but only reported them after Lumpkins told him Smith had complained about him and he should write something up." (*Id.*)

3. "[T]here is no evidence Lumpkins, Hopper, or Brooks discussed any of the alleged insubordination incidents with Smith before Hopper and Lumpkins terminated her, which violated their policy." (*Id.*)

4. "[Defendant] did not tell [plaintiff] there was any investigation into any misconduct by her until Hopper's September 11, 2000 letter denying her grievance against Cummins . . . just two days before firing her. It made no mention of any insubordination about the grinder robot or the water leak." (*Id.*)

5. Lumpkins would not tell plaintiff who he and Brooks had taken statements from. (*Id.* at 15.)

6. Lumpkins timeline is not accurate. (*Id.*)

7. Defendant's consideration of her prior DML and other disciplinary actions was in violation of defendant's policy. (*Id.*)

The Eleventh Circuit has held:

[Courts] must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees. The factual issue to be resolved is not the wisdom or accuracy of [defendant's] conclusion that [plaintiff] was an unsatisfactory employee. [The court is] not interested in whether the conclusion is a ***correct*** one, but whether it is an ***honest*** one. Like all Title VII cases where pretext is an issue, the question the factfinder must answer is whether [defendant's] proffered reasons were a coverup for a discriminatory decision. [The court is] not in the business of adjudging whether employment decisions are prudent or fair. Instead, [its] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.

31

*Rojas*, 285 F.3d at 1342 (internal citations and quotations omitted; emphasis added).  In cases, such as this one, where none of the decisionmakers had personal knowledge of plaintiff's conduct alleged to have violated a work rule, "an employee cannot demonstrate pretext merely by showing that the work rule violation did not occur and that, therefore, the information relied upon by the decisionmaker is false," because "whether or not a plaintiff actually committed the work rule violations is immaterial on the issue of pretext."  *Sweeney v. Alabama Alcoholic Beverage Control Bd.*, 117 F. Supp. 2d 1266, 1272-73 (M.D. Ala. 2000)(citations omitted).  "[W]hat is material is whether or not the employer believed the allegations to be true, not whether they were in fact true."  *Id.*  Therefore, plaintiff's evidence that she was not insubordinate is "immaterial."

Plaintiff argues with the procedures employed by defendant and the accuracy of the facts relied upon to determine that she was insubordinate on August 25, 2000.  However, her evidence is not sufficient to establish a question of fact as to whether Lumpkins, Witten, and Hopper believed Cummins and other witnesses who had reported that plaintiff had been insubordinate on August 25, 2000, or that Lumpkins, Witten and Hopper decided to terminate plaintiff, instead of imposing a lesser form of discipline, because of her record of disciplinary action, including previous discipline for insubordination.

Because plaintiff has not produced substantial evidence of a disputed issue of fact regarding the truthfulness of defendant's articulated reasons for her termination, defendant's Motion for Summary Judgment as to plaintiff's termination claims is due to be granted and such claims will be dismissed.

32

## F. BREACH OF CONTRACT

Plaintiff argues that defendant breached its contract with her, found in the Employee Handbook and the *Integrity* document, not to tolerate discrimination and to investigate complaints of discrimination.

Pursuant to Alabama law –

> An employer's general statements of policy are no more than that and do not meet the contractual requirements for an offer. If the employer reserves in the employee handbook the right to change policies unilaterally, its reservation operates as a disclaimer to negate any inference that the handbook constitutes an enforceable contract.

*Harper v. Winston County*, No. 1021433, 2004 WL 870456 at *3-*4 (Ala. Apr. 23, 2004).

The Handbook and the *Integrity* document are no more than "general statements of policy" and both documents contain disclaimers stating that the documents are not intended to be contracts between defendant and its employees. Nothing in the record indicates that either document created a contract with plaintiff. Therefore, plaintiff's breach of contract claim is due to be dismissed.

## G. PROMISSORY FRAUD

In her Complaint, plaintiff alleges:

> Defendant represented to the plaintiff that it had a policy that it would not retaliate if an employee used [its] grievance procedure. Defendant did not intend to keep its promise of non-retaliation for grievances, but knew plaintiff and other employees would rely on this policy and file grievances under the policy.

> Plaintiff relied on the misrepresentation of the Defendant and filed a grievance alleging harassment and discrimination against management employee Paul Cummings, [sic] which resulted in her termination.

33

(Doc. 1 ¶¶ 19, 20.)   Defendant has moved for summary judgment as to this claim.   (Def. Mem. in Supp. of Mot. for Summ. J. at 17.)   Plaintiff has not presented any argument in opposition to defendant's Motion for Summary Judgment as to her promissory fraud claims. Therefore, the court finds that plaintiff has abandoned this claim. *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)).   Defendant's Motion for Summary Judgment as to plaintiff's promissory fraud claim is due to be granted, and such claim will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.   An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this _28th_ day of September, 2004.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge